UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

MARK SZITTAI,

     Plaintiff,

v.                                                  Case No.:  2:20-cv-548-SPC-NPM

CENTURYTEL SERVICE GROUP,
LLC,

     Defendant.

_____/

## OPINION AND ORDER

Before the Court are Defendant CenturyTel Service Group, LLC's Motion for Summary Judgment (Doc. 102), Plaintiff Mark Szittai's Response in Opposition (Doc. 107), and CenturyTel's Reply (Doc. 108).  For the below reasons, the Court grants CenturyTel's motion.

## BACKGROUND[1]

This case is about an employment dispute.  CenturyTel is a telecommunications company.  Szittai worked at CenturyTel as a senior account manager for nearly ten years (September 2009 to April 2019).  Szittai sold television and internet services to multiple dwelling units ("MDUs") like

---

[1] Because the Court writes for the parties, it assumes familiarity with the facts and writes only those necessary for resolving Defendant's motion.  Unless otherwise noted, the parties either agree on these facts or they were undisputed in the record.

single-family communities, condominium associations, and the builders of such developments.

When Szittai started at CenturyTel, he was the only one soliciting MDUs in his geographic area. At some point, CenturyTel hired Mark Chard, who worked with Szittai making similar sales. Szittai and Chard split Szittai's original area geographically. Their unique geographic areas were their "swim lanes"—an industry term for the opportunities a salesperson is authorized to pursue.

Around October 2018, CenturyTel hired Julie Keifer as a new sales manager to share Szittai's and Chard's territories. CenturyTel tried to carve out a swim lane for Keifer from Szittai's and Chard's lanes. But it was not an easy division.

Instead of breaking the territory geographically into thirds, CenturyTel made swim lanes based on the type of development and potential internet speed. For type of development, CenturyTel split opportunities into "brownfield" for existing MDUs and "greenfield" for new builds. Szittai and Chard kept brownfield MDUs in their areas with internet speed capacity less than 40 megs. Keifer had properties within Szittai's and Chard's territories that were greenfield or brownfield with internet speed capacity equal to or over 40 megs. But, if any brownfield MDU wanted a complete fiber overbuild, it went to Szittai and Chard.

Mitchell supervised Szittai, Chard, Keifer, and others. She had the authority to change swim lanes or assign someone a lead outside their lane. (Doc. 102-1 at 120:10-121:7-13; Doc. 102-5 at 32:19-33:19). Before Keifer was hired, Szittai had no issue with Mitchell. They had a good relationship. (Doc. 102-1 at 36:7-18, 45:8-46:3). But that changed after Keifer came aboard and for the six months that followed.

Szittai alleges Keifer received leads that should have been his, and Mitchell let her keep them. This was important because a portion of account managers', like Szittai's, compensation was based on commission from selling CenturyTel services to such leads. (Doc. 102-1 at 72:3-17). Szittai felt he should get contract renewals where he was the account manager who had signed the original contract with an MDU, even if the renewals fell into Keifer's swim lane. (Doc. 102-1 at Pg. 145). CenturyTel decided it should go by swim lane. (Doc. 102-6 at 109:23-110:11). Then there were Vasari Country Club and Huntington Lakes. For both MDUs, Keifer started working on the leads even though Szittai felt they were in his swim lane. Mitchell let Keifer have them.

Things came to a head for Szittai with Huntington Lakes. Keifer had reached out to Huntington about CenturyTel internet service and scheduled a meeting with the Homeowners' Association Board ("HOA"). (Doc. 102-4 at Pgs. 61-69). A board member, Ronald Pattilio, knew Szittai and contacted him about such service. On March 4, 2019, Szittai responded to Pattilio, "No we

cannot offer streaming video over the copper infrastructure, Julie is a new account manager, apologies she should not have called on your board, thought she knew better, I will address today."[2]  (Doc. 102-4 at Pg. 54).

The next month, CenturyTel fired Szittai because it determined the email Szittai sent to Patillo about Keifer violated its conduct code.[3]  (Doc. 102-4 at 10:13-11:16, 24:12-26:24, 27:16-29:9).  Szittai claims he was fired and faced other adverse employment actions because of discrimination and retaliation. So he sues CenturyTel for: (1) gender discrimination under Title VII of the Civil Rights Act and the Florida Civil Rights Act ("FCRA"), (2) age discrimination under the Age Discrimination in Employment Act ("ADEA") and FCRA, and (3) retaliation for reporting such gender and age discrimination under Title VII, the ADEA, and the FCRA.

## LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[2] This communication from Szittai to Patillio is described at times as a text and at others as an email in the parties' filings and the record.  The Court will refer to it as an email, but whether it was a text or email is immaterial.

[3] Mitchell and CenturyTel Human Resources also discussed poor sales performance, but CenturyTel did not give that as an official reason for Szittai's firing.  (Doc. 107-2 at Pg. 28-32).

Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.* "[A] mere scintilla of evidence" does not create a genuine issue of material fact, so a nonmoving party may not simply say, "the jury might, and legally could, disbelieve the moving party's evidence." *Hinson v. Bias*, 927 F.3d 1103, 1115-16 (11th Cir. 2019) (internal quotation marks and citation omitted).

For issues the movant must prove, the "movant must affirmatively show the absence of a genuine issue of material fact, and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of Melbourne, Fla.*, 515 F. App'x 832, 834 (11th Cir. 2012) (citation omitted). But for issues on which the non-movant bears the burden, the movant has two options: (1) point out a lack of evidence to support the nonmoving party's case; or (2) provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *United States v. Four Parcels of Real Prop. in Green and Tuscaloosa Cntys.*, 941 F.2d 1428, 1437-38 (11th Cir. 1991) (citation omitted). "The burden then shifts to the non-moving party, who must go beyond the pleadings and present affirmative evidence to show that a

genuine issue of material facts exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citation omitted).

Courts may not make credibility determinations or weigh the evidence when reviewing the record. *See Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010). Courts view evidence and draw all reasonable inferences in the nonmoving party's favor. *Rojas v. Florida*, 285 F.3d 1339, 1341–42 (11th Cir. 2002). But an "inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence but is pure conjecture and speculation." *Id.* at 1324.

## DISCUSSION

As stated, Szittai brings claims for discrimination and retaliation under Title VII, ADEA, and FCRA. Because "[t]he FCRA is modeled after Title VII, and claims brought under it are analyzed under the same framework," the "FCRA claims do not need separate discussion and their outcome is the same as the federal claims." *Fuller v. Edwin B. Stimpson Co.*, 598 F. App'x 652, 653 (11th Cir. 2015). The same is true for age discrimination and retaliation claims under federal and state law. *See Regina v. Weiss Gifted & Talented Sch., Inc.*, 2023 WL 116652, at *1 (11th Cir. Jan. 6, 2023); *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010). The Court thus will discuss the gender discrimination claims together and do the same for the age discrimination and retaliation ones.

## A. Gender Discrimination

Under Title VII, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's [gender]." 42 U.S.C. § 2000e-2(a)(1). When direct evidence of discrimination is unavailable (like here), a plaintiff may present circumstantial evidence of discrimination under the *McDonnell Douglas* burden-shifting framework to create a jury question. *Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir. 2001); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff must initially establish a prima facie case of gender discrimination by preponderance of the evidence with four elements: (1) he is a member of a protected class; (2) he was qualified to do the job; (3) he was subject to an adverse employment action; and (4) the employer treated similarly situated employees outside his protected class ("comparators") more favorably or he was replaced by someone outside his protected class. *See Earle v. Birmingham Bd. of Educ.*, 843 F. App'x 164, 166 (11th Cir. 2021); *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015).

If a plaintiff proves a prima facie case, then the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *McDonnell Douglas*, 411 U.S. at 802. If the

defendant carries this burden, then the plaintiff may "have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). But "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253; *Ingram v. Sec'y of the Army*, 743 F. App'x 914, 916 (11th Cir. 2018).

Viewing the facts in a light most favorable to Szittai, he has shown a prima facie case of gender discrimination. Szittai is a member of a protected class who was qualified for his job yet subjected to two adverse employment actions— losing leads and being fired.[4] *See Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) ("Tangible employment actions consist of things that affect continued employment or pay—things like terminations,

---

[4] Szittai also claims to have suffered other adverse employment actions: a lower annual performance review and placement on a performance improvement plan. But neither are substantial enough to be actionable because the record lacks evidence that either led to less pay or some other negative consequences. *See Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860 (11th Cir. 2020) ("Title VII makes discriminatory treatment actionable only if it reaches a sufficient level of substantiality. Trivial slights are not actionable") (citation omitted); *Redd v. United Parcel Serv., Inc.*, 615 F. App'x 598, 603 (11th Cir. 2015) (finding placement on a performance improvement plan that changed no pay, benefits, or workload was not an adverse employment action actionable under Title VII). At most, there may have been the loss of a one-time stipend because of the lower annual performance review, but Szittai could not remember if he had still received a stipend or any difference between one he received and one he would have received with a higher performance review. (Doc. 102-1 at 33:24-36:1, 52:18-54:4). The Court thus will examine Szittai's discrimination and retaliation claims considering his lost leads and termination as the actionable adverse employment actions.

demotions, suspensions without pay, and pay raises or cuts—as well as other things that are similarly significant standing alone."); *see U.S. Equal Emp. Opportunity Comm'n v. Nice Sys., Inc.*, No. 20-81021-CV, 2021 WL 3707959, at *3 (S.D. Fla. Aug. 5, 2021) ("Deprivation of income *or an income-earning opportunity*…can amount to an adverse employment action.") (emphasis added).  And, at this stage, the Court will assume without deciding that Szittai has offered enough evidence to make Keifer his comparator and show that she was treated better than him or at least that he was replaced by someone outside his protected class—Szittai has evidence Keifer took over at least some of his work.  *Cf. Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) ("It matters not whether [plaintiff] has made out a prima facie case if she cannot create a genuine issue of material fact as to whether [defendant's] proffered reasons for firing her are pretext masking discrimination.").  The burden (which is one of production, not persuasion) then shifts to CenturyTel.

With the ball in CenturyTel's court, it offers legitimate, nondiscriminatory reasons for firing Szittai and not giving him certain leads. CenturyTel said it fired Szittai because of the email he sent to Pattilio on March 4, 2019, about Keifer.  CenturyTel found this email violated its conduct code.  (Doc. 102-4 at 10:13-25, 11:1-16, 24:12-26:24).

For the lost leads, CenturyTel explained the situation as follows: for the renewals, CenturyTel implemented a policy across the organization that

renewals would be handled by swim lane (and not by the account manager who signed the original contract). (Doc. 102-6 at 109:23-110:11, Pg. 87).  For Vasari, Keifer originally took the lead because she and the sales engineer put an incorrect address into a system that showed a higher internet capacity—one within Keifer's lane.  Mitchell decided to leave it with Keifer since Keifer did some work on the lead and Szittai had never worked on it. (Doc. 102-1 at Pgs. 128-129).  For Huntington, Keifer had done work on it and Mitchell believed it was in Keifer's lane and so left it with her. (Doc. 102-6 at 144:1-147:18, 243:9-244:9).

Because CenturyTel has produced legitimate, non-discriminatory reasons, Szittai must show the reasons are pretext for unlawful discrimination. *Tebo v. City of DeBary, Fla.*, 784 F. App'x 727, 730 (11th Cir. 2019).  A reason cannot be pretext for discrimination unless the plaintiff shows both that the reason was false and that discrimination was the real reason. *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006).  Nor can the plaintiff "recast an employer's articulated non-discriminatory reasons or substitute his business judgment for that of the employer's.  The plaintiff must meet a proffered reason that might motivate a reasonable employer head on and rebut it, and cannot simply quarrel with the wisdom of the reason." *McPhie v. Yeager*, 819 F. App'x 696, 699 (11th Cir. 2020).  Szittai can show

neither CenturyTel's reasons were false nor discrimination was the true reason for either termination or lost leads.

The Court begins with Szittai's termination.  Szittai's best argument that CenturyTel's reason for firing him was false is two-fold: (1) his email to Patillo simply wasn't that bad, and (2) he was a strong salesman—so the email could not have been the real reason for his firing and it must be impermissible discrimination.  Remember, Szittai's email stated, "No we cannot offer streaming video over the copper infrastructure, Julie is a new account manager, apologies she should not have called on your board, thought she knew better, I will address today." (Doc. 102-4 at Pg. 54).  And it is undisputed Szittai was a strong salesman.  In December 2017, he was ranked number one in the east region.  (Doc. 102-6 at 140:18-141:6).  In September 2018, Szittai was the number two CenturyTel salesperson in his Field Sales group.  (Doc. 102-3 at Pg. 35-37).

But this is not evidence CenturyTel's reason was false. First, it matters not if the Court, or Szittai, considers his email a fire-able offense.  It is not the Court's—or Szittai's—judgment that matters.  It is CenturyTel's.  CenturyTel's Conduct Code has unifying principles of fairness, honesty and integrity, and respect—principles CenturyTel says Szittai violated in his offending email. (Doc. 102-4 at Pg. 30).  First, CenturyTel found Szittai violated its principles of fairness ("Exercise fairness in all dealings with customers, business

associates and fellow employees") and respect ("[R]espect each employee…as individuals deserving our compassion") by how he represented Keifer's capability with a prospective customer. (Doc. 102-4 at 24:12-25, Pg. 30). Second, CenturyTel found Szittai was disingenuous in his implication that he was Keifer's boss in violation of the honesty and integrity principle ("Be truthful and demonstrate integrity in all our dealings"). (Doc. 102-4 at 80:4-9, Pg. 30). Third, CenturyTel says Szittai violated its personal conduct code ("While on the job and while representing CenturyLink we should conduct ourselves in a cooperative, responsible, respectful and honest manner") for the reasons above and for failing to operate cooperatively with Keifer prior to his email. (Doc. 102-4 at 58:5-59:18, Pg. 36). Szittai offers no evidence that his email did not violate CenturyTel's conduct code, nor any evidence CenturyTel applied the code inconstantly to him compared to other employees.

Second, it is undisputed that Szittai's email produced backlash. The Huntington HOA originally cancelled its meeting with Keifer and at least the HOA President, Robert Seaman, assumed Szittai was Keifer's manager. (Doc. 102-4 at Pg. 61; Doc. 102-5 at Pg. 50). Mitchell spoke to Seaman over the phone, and he said he was put off by what he heard Szittai had said about Keifer and that it was unprofessional. (Doc. 102-6 at Pg. 278). And Szittai admitted he was frustrated when he sent the email and described it as the

possible "culmination of prior vents stacking up one right after the other." (Doc. 102-1 at 153:8-19).

Third, while Szittai was a strong salesman, his employment was not without wrinkles. Repeatedly in performance reviews, CenturyTel told Szittai his communication needed improvement, including that he should "better control his emotions," practice "a less argumentative style," and manage "passion and frustrations" to "limit 'rapid fire' emails and making negative comments in meetings/discussions." (Doc. 102-1 at Pgs. 59-60, 63, 69, 75). One performance review cited a communication misstep that led to a competitor sending CenturyTel a cease-and-desist letter. (Doc. 102-1 at Pg. 69). Szittai even described himself as, "an aggressive salesperson that pushed the envelope because I wanted to get my deals through." (Doc. 102-1 at 61:4-7). Given this history, Szittai's email may have been the straw that broke the camel's back. And even if it was just Szittai's email to Patillo, CenturyTel can choose to prioritize an employee's communication ability over his sales record.

In sum, Szittai has no evidence a reasonable jury could use to find CenturyTel's reason for firing him false. At best, Szittai questions CenturyTel's wisdom and business judgment in firing him—which is not enough. CenturyTel can fire Szittai "for a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a

discriminatory reason." *Minard v. Sam's E., Inc.*, No. 21-11494, 2022 WL 854541, at *4 (11th Cir. Mar. 23, 2022).

On top of that, Szittai has no evidence that his gender was even a factor—let alone a motivating factor—in his firing. CenturyTel is steadfast that gender played no role. (Doc. 102-4 at 79:23-80:3; Doc. 102-5 at 55:18-23). Szittai has nothing to counter that point. In fact, he admitted that he did not think his age or gender had anything to do with his workplace struggles. (Doc. 102-1 at 37:13-21; Doc. 102-1 at 174:3-25). Szittai even testified, "I have no idea why Monya Mitchell favored [Keifer] over me; it just happened. Why she did it, I don't know . . . I didn't know why, I still don't." (Doc. 102-1 at 141:1-6, 16-22).

The Court next considers Szittai's lost leads. Szittai also falls short of showing pretext. Considering the evidence in the light most favorable to Szittai, Mitchell gave Keifer two leads that were in Szittai's swim lane—Vasari and Huntington. But Szittai has no evidence Mitchell's proffered reasons for giving Keifer those leads were false—Szittai offers nothing to show that an incorrect address was not used for Vasari (causing Keifer to start work on it), or that Keifer did no work on Vasari or Huntington. Nor does Szittai have evidence Mitchell knew she was mistaken in her belief that Huntington belonged to Keifer. It matters not if Mitchell was wrong—only that she believed her reason. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253,

1266 (11th Cir. 2010) ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head.").

Further, it is undisputed that Szittai's swim lane division with Keifer based on type of MDU and potential internet speed was murkier than the clear geographic division between Szittai's and Chard's swim lane. Even the account managers did not always know into what lane an opportunity fell. (Doc. 102-3 at 66:9-67:22, 80:10-17; Doc. 102-6 at 57:15-58:6). For example, a brownfield community with internet speed capacity over 40 megs (Keifer's swim lane), could later decide it was interested in a complete fiber overbuild (Szittai's swim lane). (Doc. 102-4 at 20:20-21:25, 65:18-66:21). And some communities had higher internet speed capacity at some sites within the community, but not others—it seems this was the issue with Huntington. (Doc. 102-1 at 137; Doc. 102-3 at 66:9-67:22, 83:17-84:2). And even if it was clear which lane a lead fell into, it could be erroneously assigned in SalesForce—a program CenturyTel used to assign and track leads—to a different manager. (Doc. 102-1 at Pgs. 133-134, 136; Doc. 102-2 at Pgs. 60-62; Doc. 102-3 at 74:17-75:18, 80:10-17, 102:9-103:10, Pg. 55). So it makes sense that assigning leads between Szittai and Keifer was not black and white.

Turning to renewals—that they should go to the person whose lane they fell into, not the person who signed the original contract—this was the policy

CenturyTel implemented across the entire organization. (Doc. 102-6 at 109:23-110:11, Pg. 87).   While Szittai clearly disagreed with CenturyTel's renewal policy, he offers no evidence it was not the policy or that it did not apply equally across all account managers.  His disagreement with the underlying reasoning behind the policy isn't enough for pretext.  *See McPhie*, 819 F. App'x at 699 ("Federal courts are not super-personnel departments, and the wisdom of an employer's business decision is irrelevant if it was not made with a discriminatory motive." (citation omitted)).

What's more, Szittai has no evidence his gender played any part in how Mitchell assigned leads.  In fact, the record shows Mitchell did not always let Keifer keep leads: Keifer was assigned leads that should have been Szittai's by swim lane and that were switched back to Szittai.  (Doc. 102-1 at Pg. 136).  And, in at least one case, Keifer believed a lead was really hers, but Mitchell left it with Szittai. (Doc. 102-1 at 136:21-139:1; Doc. 102-2 at 152:6-21).

Boiled down, Szittai falls short on pretext because he has no evidence that CenturyTel's reasons for his firing and lost leads were false, and that gender was a motivating factor.   Szittai thus has not created a triable issue of fact as to whether he was the victim of intentional gender discrimination.

That said, *McDonnell Douglas* is not the only way Szittai may survive summary judgment.   Szittai may also overcome summary judgment by presenting a convincing mosaic of circumstantial evidence that creates a

triable issue concerning CenturyTel's discriminatory intent. *McPhie*, 819 F. App'x at 699. The circumstantial evidence must be sufficient to raise a reasonable inference that the employer discriminated against him. *Id.* For the same reasons why Szittai cannot show pretext, he also has no convincing mosaic of circumstantial evidence to show gender was a motivating factor in Szittai's lost leads or termination. Quite the opposite. The undisputed record shows that in 2017, a higher up at CenturyTel wanted to fire Szittai for sharing unauthorized pricing information with a client and Mitchell stood up for him and saved his job. (Doc. 102-1 at 101:14-102:7, Pgs. 110-117). And around the same time CenturyTel hired Keifer, Mitchell encouraged Szittai to apply for a promotion. (Doc. 102-1 at 65:18-66:7).

At bottom, Szittai has not adduced enough evidence for an actionable gender discrimination claim. At best, he argues with the wisdom of CenturyTel's decisions to fire him and assign leads—not enough to defeat summary judgment. The Court thus grants CenturyTel's motion for summary judgment on the gender discrimination claims (Counts I and II).

## B. Age Discrimination

Next are the age discrimination claims. The ADEA prohibits an employer from discriminating against an employee based on age. Courts use the *McDonnell Douglas* burden-shifting framework to analyze age discrimination claims based on circumstantial evidence, like here. *See Lowe v.*

*Exel, Inc.*, 758 F. App'x 863, 865 (11th Cir. 2019).   This means an employee must show a prima facie case of age discrimination.   If he does, the burden shifts to the employer to give a legitimate, nondiscriminatory reason for the adverse employment action.   If it does, the employee needs to show the reason is pretext and discrimination was the but-for cause of his firing.   *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).

Szittai's age discrimination claims fail for the same reasons his gender discrimination claims do—he has no evidence that CenturyTel fired him or denied him leads because of his age.   Szittai's best age discrimination argument is the same as for gender—that his email simply wasn't that bad and he was a strong salesman.   The Court already discussed why this fails. Further, Szittai presents no evidence that age was a reason for his firing, much less the but-for cause.   The but-for standard for age discrimination is a higher bar than the motivating factor standard for gender discrimination.   So, if Szittai has not met the lower standard for gender discrimination, he certainly has not met the more onerous one for age discrimination.

Because Szittai has not created a triable issue of fact as to age discrimination, the Court grants CenturyTel's motion for summary judgment on those counts (Counts III and IV).

## III. Retaliation

Last are Szittai's retaliation claims. Federal and state law prohibit an employer from retaliating against an employee for reporting gender and age discrimination. The *McDonnell Douglas* burden-shifting framework applies for circumstantial cases, like this one. *Tebo*, 784 F. App'x at 730. This framework requires the plaintiff to show a prima facie case, the employer to offer legitimate, non-retaliatory reasons, and the plaintiff to show the employer's reasons were pretext and the real reason is retaliation. *See Williams v. Fla. Atl. Univ.*, 728 F. App'x 996, 1000 (11th Cir. 2018). At the end of the day, retaliation must be the but-for cause of the adverse employment action. *See Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013); *see also Jurriaans v. Alabama Coop. Extension Sys.*, 806 F. App'x 753, 757 (11th Cir. 2020); *Palm Beach Cnty. Sch. Bd. v. Wright*, 217 So. 3d 163, 165 (Fla. Dist. Ct. App. 2017).

Szittai's retaliation claims fail for two reasons. First, he cannot establish a prima facie case of retaliation, which requires three elements: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *Jurriaans*, 806 F. App'x at 757. Szittai lacks evidence he engaged in a statutorily protected activity like complaining about gender or age discrimination. According to Szittai, he complained to Mitchell about lost leads

given to Keifer.  Even so, he never complained (or even hinted) about gender or age discrimination in those complaints.  (Doc. 102-1 at 36:19-37:21); *see Ingram v. Sec'y of the Army*, 743 F. App'x 914, 918 (11th Cir. 2018) (finding no statutory protected activity when emails complaining of a work conflict did not suggest the conflict was motivated by improper animus).  In fact, Szittai repeatedly testified that he did not know why Mitchell gave leads to Keifer and did not think it was because of his gender or age. (Doc. 102-1 at 141:1-6, 16-22).  Because of this, Szittai lacked a good faith belief that CenturyTel was engaged in unlawful employment practices when he made these complaints to Mitchell—a prima facie requirement.  *See Anduze v. Fla. Atl. Univ.*, 151 F. App'x 875, 878 (11th Cir. 2005) (explaining a plaintiff must have a good faith, reasonable belief that the employer was engaged in unlawful employment practices to establish a prima facie Title VII retaliation case).  So Szittai's complaint to Mitchell does not qualify as statutorily protected activity.

Second, even if Szittai met his prima facie burden, Szittai lacks any evidence his complaints to Mitchell about lost leads were the but-for cause of him losing other leads or being fired.  Again, CenturyTel provided reasons for firing Szittai and assigning leads to Keifer—reasons Szittai offers no evidence to disprove.  Nor does Szittai present evidence linking his complaints to his firing.  So Szittai's retaliation claims (Counts V – VIII) must be dismissed.

In sum, the Court grants CenturyTel's motion for summary judgment. Szittai cannot prevail on his claims.

Accordingly, it is now

**ORDERED:**

1. Defendant's Motion for Summary Judgment (Doc. 102) is **GRANTED**.

2. The Clerk is **DIRECTED** to enter judgment, deny any pending motions, terminate all deadlines, and close the case.

**DONE** and **ORDERED** in Fort Myers, Florida on August 16, 2023.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  All Parties of Record